# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

GREG E. LINDBERG,

    PLAINTIFF,

v.                            Case No.  8:25-cv-00897-SDM-NHA

NEIL WEINBERG; JACKIE
DAVALOS; SOPHIE ALEXANDER;
and BLOOMBERG, L.P.,

    DEFENDANTS.

_____/

## DEFENDANT BLOOMBERG L.P.'S *AMENDED*[1] MOTION TO DISMISS COMPLAINT AND FOR FEES WITH SUPPORTING MEMORANDUM OF LAW

---

[1] This Amended Motion is filed only to correct a formatting error in the version filed at D.E. 23.

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Bloomberg L.P. ("Bloomberg") moves to dismiss the Plaintiff Greg Lindberg's ("Lindberg" or "Plaintiff") Complaint.

Plaintiff, a felon convicted of bribery and fraud, claims that Bloomberg damaged his reputation when it shined a light on his self-described "baby project"—a carefully-plotted effort to select, manipulate, and exploit egg donors and gestational carriers—in its deeply-reported December 2024 article "*How a Billionaire's 'Baby Project' Ensnared Dozens of Women*" (the "Article"). *See* Compl. ¶ 16; Ex. A, at 3, 7, 11; Ex. B, at 1. But, to be sure, any damage to Plaintiff's reputation is the result of his own choices. Drawing extensively on court records, medical documentation, interviews with experts, accounts of individuals with firsthand knowledge of relevant events, and Lindberg's <u>own statements</u>, the Article simply recounted truthful, newsworthy information about his procreation efforts and legal troubles. *See generally id.* Ex. A.

This lawsuit is little more than a transparent attempt to censor constitutionally-protected speech—opinion and well-supported commentary on important public issues—that Plaintiff dislikes. The Constitution forbids using the tort of defamation in this way, and this Court should dismiss the case outright.

The Complaint is legally deficient for multiple, independent reasons. To start, it does not identify any specific statement—or implication—that could result in liability. Each challenged statement, "suggest[ion]," and "portray[al]" is either protected opinion based on disclosed facts, rhetorical in nature, or otherwise, at a minimum, substantially true. The remaining claims—false light, tortious interference,

1

and the request for injunctive relief—are independently barred under well-established law. Finally, because this lawsuit targets constitutionally protected reporting on a matter of public concern, Bloomberg also seeks an award of its attorneys' fees and costs under Florida's substantive anti-SLAPP statute, Section 768.295, Florida Statutes. [2]

## MEMORANDUM OF LAW

## BACKGROUND

At the time of the Article's publication, Lindberg—a self-described "widely known" and "renowned entrepreneur, philanthropist, and author" (Compl. ¶ 1)—had twice been convicted of federal bribery charges, pleaded guilty to fraud conspiracy and money laundering, and was in federal custody awaiting sentencing. *See* Compl. ¶¶ 1, 14; Ex. A, at 3; Ex. B, at 1. Lindberg's legal troubles, and the $2 billion insurance scheme that led to them, drew national attention to his political donations, business dealings, and high-profile prosecution. *See id.* Ex. A, at 3, 6-7. While under indictment and later incarcerated, Lindberg pursued what he called his "baby project"—a personal effort to conceive dozens of children through egg donation and surrogacy. *Id.* The end-goal: "to have a child that, ultimately, [he] couldn't lose in a custody battle." *Id.* Ex. A, at 6-7. The Article states that sources described Lindberg as being fixated on having as many as 50 children. *Id.* Ex. A, at 4.

---

[2] State substantive law applies in this diversity action. *See Parekh v. CBS Corp.*, 820 F. App'x 827, 836 (11th Cir. 2020) (applying Florida's anti-SLAPP statute); *Bongino v. Daily Beast Co.*, 477 F. Supp. 3d 1310, 1321-25 (S.D. Fla. 2020) (same).

Lindberg was not operating in obscurity. At the height of his wealth, he controlled a network of insurance companies, reportedly amassed a personal fortune exceeding $1 billion, and regularly used public channels—including press interviews and published books—to shape his image and self-described renown. *See* Compl. ¶¶ 1, 14; Ex. A, at 3, 5, 7-8, 11-12, 16. During one interview with Bloomberg, he met reporters at a JW Marriott in Tampa while wearing an ankle monitor, handed out copies of his books—one of which compares modern billionaires to Socrates—and promoted his wellness startup. *Id.* Ex. A, at 16.

The Article reports the following unchallenged facts about the baby project—based on a wealth of source material Lindberg does not challenge, including interviews with the women running the project, egg donors, legal filings, and medical and financial records. *Id.* Ex. A, at 2, 12-14. With the assistance of his fiancée, Olivia Molina, and others, Lindberg recruited at least 25 women to be egg donors or surrogates. *Id.* Ex. A, at 3, 11. Molina contacted potential donors on Instagram, favoring women with light features—blonde hair and blue or green eyes. *Id.* Ex. A, at 12. Almost all donors "say Lindberg eventually told them he wanted to have kids with them because of their looks." *Id.* Ex. A, at 9. Molina told Bloomberg that Lindberg "preferred blue eyes because they were rare." *Id.* Ex. A, at 12. Yet, Lindberg said "[d]iversity is important in the gene pool," a comment he made to Bloomberg about his partnership with Molina, who has brown hair and brown eyes. *Id.*

The Article reports several women who participated in Lindberg's fertility arrangements said they were misled about his involvement or about the nature of the

arrangement. At least two donors said they did not learn Lindberg's name or that he was in prison until after they had agreed to participate. *Id.* One donor said she initially believed she was donating to a family who could not have children. *Id.* Another says she was instructed to misrepresent her relationship to Lindberg at a fertility clinic. *Id.* Ex. A, at 2. In some cases, donors were abruptly cut off from communication after their donations or procedures (and having been romantically wooed by Lindberg), and at least one surrogate did not receive the full amount of payment promised. *Id.* Ex A, at 2, 13. The Article reports the women signed agreements abandoning parental rights—in some cases on the advice of attorneys Lindberg had selected and paid. *Id.* Ex. A, at 9. In at least one contract reviewed by Bloomberg, Lindberg named two of his personal assistants—not family or the child's biological mother—as the backup custodians in the event of his death. *Id.* Ex. A, at 14.

Even after his first conviction in 2020, Lindberg continued coordinating the project from prison, directing staff and Molina to continue to recruit egg donors—and spend as much as they needed to do it. *Id.* Ex. A, at 13-14. The Article recounts employee concerns about how children would be cared for, with one asking, "How are we going to pay for the nannies, etc for these babies when they get here?" and the other responding that they were already "broke." *Id.* Ex. A, at 12-13. Molina, Lindberg's fiancée who coordinated many aspects of the project, told Bloomberg she was "exhausted" and they "already had too many babies." *Id.* Ex. A, at 15.

The Article also draws on extensive research about the fertility industry—a largely self-regulated space, despite the sensitive legal and medical issues that can arise.

*Id.* Ex. A, at 5-6. It features commentary on Lindberg's baby project from experts, including doctors, clinical psychologists, professors, and industry groups. Many questioned the ethical and medical implications of the project, echoing the concerns voiced by donors and others who witnessed or participated in the egg extraction and donation process. *See generally id.* Ex. A. The Article reports that clinics screened donors quickly and pushed procedures through despite signs of emotional and physical strain. At least one Chicago clinic received above-market compensation and treated multiple surrogates at once. *Id.* Ex. A, at 5-6, 12, 14.

<u>The Complaint</u>

The Complaint does not challenge the core factual content of the Article. Lindberg does not dispute that he was convicted of multiple felonies, engaged in a large-scale effort to father children through assisted reproduction, or continued the project while in custody. The Complaint does not take issue with the accounts of Lindberg selecting donors based largely on "looks" and "genetics," including hair and eye color. *Id.* Ex. A, at 4, 9, 12-13. It does not challenge the reporting that several women say they were misled or manipulated: offered emotional intimacy or promised future involvement with children, to have all contact with the child abruptly severed. *See generally id.* Ex. A.

Instead, cherry-picking, Lindberg takes issue with a handful of what he apparently believes are implications or suggestions emanating from the Article's undisputed facts. In some cases, he has characterized them as "specific false and defamatory statements." But many of these alleged statements do not actually appear

5

in the Article. And to the extent these "statements" are construed as suggestions or implications—all are nonactionable for several, independent reasons outlined below.

## The Counts

**Counts I and II (Defamation Per Se and Per Quod):** Although these are distinct legal claims, Lindberg does not differentiate between them in the Complaint. Instead, he incorporates every prior paragraph of the Complaint into each count without identifying which statements are alleged to be *per se* defamatory—as opposed to requiring extrinsic explanation of their allegedly defamatory nature (*per quod*). The vague impressions Lindberg identifies as being allegedly defamatory—misquoted and unmoored from any specific passage of the Article—do not meet even minimal pleading standards and are nonetheless not actionable as a matter of law.

**Count III (Tortious Interference):** This count is duplicative of the defamation claims and independently barred by Florida's single-action rule, which precludes multiple tort theories based on a single publication.

**Count IV (False Light):** Since 2008, this claim has not been recognized under Florida law. *See Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1113-14 (Fla. 2008). Including it in a complaint is, at best, frivolous—if not a misrepresentation to this Court.

**Count V (Injunctive Relief):** Lindberg seeks an order restraining the statements within the Article that he alleges are defamatory. But injunctive relief against constitutionally protected speech is barred, and this request should be swiftly denied.

## LEGAL ARGUMENT

On a motion to dismiss, the Court "must accept the allegations of the complaint as true and must construe the facts alleged in the light most favorable to the plaintiff." *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994). "However, conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003) (citation omitted). Plaintiffs cannot simply regurgitate labels, conclusions, and "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The touchstone is that "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

As the 11th Circuit has noted, testing a complaint against the plausibility standard is especially critical in public figure defamation suits, like this one:

> [T]here is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation. Indeed, the actual malice standard was designed to allow publishers the "breathing space" needed to ensure robust reporting on public figures and events. *Sullivan*, 376 U.S. at 271-72 . . . . Forcing publishers to defend inappropriate suits through expensive discovery proceedings in all cases would constrict that breathing space in exactly the manner the actual malice standard was intended to prevent. The costs and efforts required to defend a lawsuit through that stage of litigation could chill free speech nearly as effectively as the absence of the actual malice standard altogether.

*Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016).

The *Michel* warnings ring true here. Lindberg's Complaint attempts to punish First Amendment-protected reporting through vague allegations and

mischaracterizations untethered from the Article's actual content. He asks this Court to treat plainly protected journalism as defamation. But *Michel* confirms that courts play a vital gatekeeping role—ensuring meritless suits like this one do not chill free expression through costly, protracted discovery. As set forth below, Lindberg's Complaint fails to state any cognizable claim and should be dismissed with prejudice.

## I.    PLAINTIFF'S DEFAMATION CLAIMS ARE LEGALLY DEFICIENT ON THEIR FACE AND SHOULD BE DISMISSED

Under Florida law, defamation "has these five elements: (1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018); *see also Jews for Jesus, Inc.*, 997 So. 2d at 1106.  On fault, "a defendant may not be held liable for defaming a public figure about a matter of public concern unless he is shown to have 'acted with actual malice.'" *Berisha v. Lawson*, 973 F.3d 1304, 1310 (11th Cir. 2020); *see also Mile Marker, Inc. v. Petersen Publ'g, LLC*, 811 So. 2d 841, 845 (Fla. 4th DCA 2002). As discussed below, the Complaint is fatally flawed in this and other regards.

### A. Lindberg Does Not Identify Any Defamatory Statement With Sufficient Particularity.

To begin with, the Complaint's allegations do not meet the fundamental legal requirement of all defamation claims: that they must identify the defamatory statement

with sufficient particularity.[3] Lindberg vaguely alleges that the Article "portray[s]" him as "an unethical businessman and negligent parent" (Compl. ¶ 2) and that it suggested his use of egg donors was "off" and "jarring." *Id.* ¶ 16. But these are characterizations, not words appearing anywhere in the Article. The Complaint's failure to identify specific allegedly defamatory statements and how they are false is fatal, as a threshold matter. *See Montano v. Washington State Dep't of Health*, No. 1:23-23903, 2024 WL 3029155, at *9 (S.D. Fla. May 28, 2024), *adopted by* 2024 WL 3026528 (S.D. Fla. June 17, 2024), (dismissing complaint for merely referencing alleged "false charges" and "defamatory articles" without further specificity as to particular statements sued upon); *Basulto v. Netflix, Inc.*, No. 1:22-CV-21796, 2023 WL 7129970, at *21-22 (S.D. Fla. Sept. 20, 2023) (noting it is "so critical" for a defamation plaintiff to "identify[] allegedly defamatory statements with 'sufficient particularity.'").

The only place the Complaint attempts to identify specific language comes buried within Count V, seeking injunctive relief—four counts *after* the first defamation count—where Lindberg recites a list of purported "specific false and defamatory statements" from the Article. *See* Compl. ¶ 42. But these phrases are largely misquoted,

---

[3] Relatedly, Lindberg's defamation claims also fail as a matter of law for his failure to comply with Section 770.01, Florida Statutes, which requires plaintiffs in a defamation suit against a media defendant to serve a written notice on the defendant, specifically identifying the allegedly false and defamatory statements at least five days prior to filing a lawsuit. As explained by the Florida Supreme Court in *Ross v. Gore*, 48 So. 2d 412, 415 (Fla. 1950), compliance with Section 770.01 is a condition precedent to initiating a defamation lawsuit against a media defendant. But here, Lindberg never served a Section 770.01 notice on any defendant. Lindberg's "failure to comply with such a statutory condition precedent requires dismissal" of his defamation claims. *Intihar v. Citizens Info. Assocs.*, LLC, No. 2:13-cv-720-FtM-29CM, 2014 WL 842464, at *3 (M.D. Fla. Mar. 4, 2014).

mischaracterized, or fabricated. For example, Lindberg repeats his claim the Article described his reproductive choices as "off" and "jarring," but those words appear nowhere in the Article. *See id.* He also alleges the Article states he selected egg donors "based exclusively on eye color," which it does not. *See id.* And although he takes issue with the use of the word "conned," which does appear in the Article's subheading, he does not explain how that phrasing—clearly summarizing the firsthand accounts described in the body of the Article—constitutes a false factual assertion. *See id.* At best, these allegations reflect disagreement with tone, emphasis, or interpretation—not the sort of clear, provably false statements that can support a defamation claim.

To the extent the Complaint can be read as targeting any of these phrases, they are legally deficient for multiple independent reasons, as discussed further below.

**B. Rhetorical Hyperbole/Opinion Are Not Actionable as a Matter of Law.**

Rhetorical hyperbole and opinions—statements that cannot be proven true or false—are not actionable. Whether a statement can be proven false (or true) is a question of law, properly decided by the Court on a motion under Rule 12(b)(6). *See Turner*, 879 F.3d at 1262-63 ("True statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment."); *see also Milkovich v. Lorain Journal, Co.*, 497 U.S. 1, 2 (1990) ("[S]tatements that cannot reasonably be interpreted as stating actual facts about an individual are protected.").

As set forth below, Lindberg's claims hinge on ambiguous, non-definable terms—like "off," "jarring," and "conned"—as well as vague allegations that the

Article "portray[s him] as an unethical businessman and negligent parent." *See* Compl. ¶¶ 2, 16, 42. These are not assertions of fact; they are subjective impressions and evaluative summaries of conduct that cannot be proven false. They cannot support a defamation claim as a matter of law.

1. "Off" and "Jarring"

Lindberg alleges the Article falsely portrays his "family planning decisions as 'off' and 'jarring.'" *See id.* ¶¶ 16, 42. Though the Complaint puts them in quotes, these words appear nowhere in the Article. *See generally id.* Ex. A.

Even if the Article had described Lindberg's choices as "off" or "jarring" (which it does not), those words are quintessential examples of opinion: terms that cannot be proven true or false. *See Turner*, 879 F.3d at 1262-63. There is no objective standard for evaluating whether someone's reproductive choices are emotionally disturbing or socially inappropriate. These phrases reflect individual perception, not falsifiable fact. As such, they cannot form the basis of a viable defamation claim. *See Utterback v. Morris*, No. 24-12947, 2025 WL 1455900, at *7 (11th Cir. May 21, 2025) (reiterating that a speaker's "subjective assessment" based on facts set forth in the publication "is pure opinion and is not actionable as a matter of law" (quoting *Button v. McCawley*, 2025 WL 50431, at *6 (S.D. Fla. Jan. 8, 2025)).

Indeed, Lindberg is not challenging actual language in the Article, but rather the emotional tone he perceives in the reporting. That kind of abstract disagreement— untethered from any concrete quotation—is not only legally deficient, but also illustrates how far removed the Complaint is from the Article's actual content.

11

2.  "Conned"

Lindberg also claims that the Article contains the "specific and false defamatory statement" that "Lindberg 'conned' women into donating eggs to him." Compl. ¶ 42. That alleged "statement" does not appear in the Article. The word "conned" does appear once, in the subheading, and in the context of a summary of several women's statements about their experiences being his donors and surrogates. *See id.* ¶ 42; Ex. A, at 1. But even construing Lindberg's imprecisely-pleaded allegation in the most favorable light to him does not salvage this claim. The Article's use of the word "conned" is still not actionable, since it constitutes both rhetorical hyperbole and pure opinion based on disclosed facts.

Courts routinely hold that words like "conned," "con artist," and "scammer" are not provable assertions of fact, but rather evaluative terms that reflect opinion/rhetorical hyperbole. *See Kirkland v. Env't Landscape, LLC*, No. 1:22-cv-414, 2025 WL 474232, at *14 (S.D. Ohio Feb. 12, 2025) (noting "majority position" that "scammer" and "con artist" are nonactionable opinion); *Clifford v. Trump*, 339 F. Supp. 3d 915, 925–28 (C.D. Cal. 2018), *aff'd*, 818 F. App'x 746 (9th Cir. 2020) ("con job" was non-actionable rhetorical hyperbole in political discourse); *Biber v. Duplicator Sales & Serv., Inc.*, 155 S.W.3d 732, 737 (Ky. Ct. App 2004) (a corporate president's statement that he "felt like he had been conned by the world's greatest con man" constituted expression of opinion, "entitled to an absolute privilege"); *Quinn v. Jewel Food Stores, Inc.*, 276 Ill. App. 3d 861, 866-67 (1995) ("con artist" held not to be a statement of fact but rather a "characterization[] and opinion[] formed based on"

disclosed facts); *Rizzuto v. Nexxus Prods. Co.*, 641 F. Supp. 473, 481 (S.D.N.Y. 1986), *aff'd*, 810 F.2d 1161 (2d Cir 1986) (references in trade journal to "unscrupulous sales people lying," "lying salesperson," "rip you off," and "don't be conned," were mere rhetorical hyperbole "considered in context with the undisputed factual material"). *Compare, e.g.*, *Carroll v. TheStreet.com, Inc.*, No. 11-CV-81173, 2014 WL 5474061, at *11 (S.D. Fla. July 10, 2014) (declining to dismiss defamation claim where the term "con artist" was directly tied to detailed, allegedly false claims that plaintiff engaged in securities fraud and stock manipulation); *Anderson v. Smith*, No. 3:19-cv-222-J-20JRK, 2020 WL 10058207, at *2 (M.D. Fla. Mar. 24, 2020) (denying motion to dismiss where the publication explicitly accused plaintiff of "defraud[ing] investors" and called her a "compulsive liar, thief and skilled con artist," with no qualifying language and in the context of a criminal financial scheme). Indeed, in the context of the Article, "conned" is used in the subheading as a shorthand to describe the personal, evaluative perspective held by the impacted women. "Florida law is clear that [such] personal opinions cannot be defamatory." *Plain Bay Sales, LLC v. Gallaher*, No. 9:18-CV-80581, 2020 WL 202960, at *3 (S.D. Fla. Jan. 14, 2020). *See also Donnelly v. McConnell*, No. 6:12–cv–670–Orl– 22KRS, 2012 WL 2402803, at *4 (M.D. Fla. June 26, 2012) (dismissing with prejudice defamation claim because, *inter alia*, alleged statements were the writer's "own assessments, opinions, and characterizations," which drew upon his experiences).

The Article very clearly provides the factual basis for this evaluative characterization, further rendering the term not actionable. *See Utterback*, 2025 WL

1455900, at *7 ("opinion based on facts which are set forth in the statement or which are otherwise known or available to the listener as a member of the public is a pure opinion, which cannot form the basis of a defamation claim" (cleaned up) (citing *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. 1st DCA 1981)); *Flynn v. Wilson*, 398 So. 3d 1103, 1113 (Fla. 2d DCA 2024) (finding alleged defamatory statement unactionable rhetorical hyperbole "because [defendant] discloses all relevant facts and employs colorful, hyperbolic language," so "the specific context of the statement does not render it an assertion of fact." (quoting *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1159 (9th Cir. 2021)). The Article lays out the underlying facts in detail, giving readers the context they need to understand why some women said they felt deceived. The subheading's phrasing may be pointed, but it is not defamatory. *See Parekh*, 820 F. App'x at 833 (finding court must look at other statements in article to determine whether challenged statement is defamatory in context); *Byrd*, 433 So. 2d at 595 (noting that articles are "to be considered with their illustrations; pictures are to be viewed with their captions; stories are to be read with their headlines"). In context, the term "conned" is not actionable as a matter of law.

### 3. "Unethical Businessman and Negligent Parent"

Lindberg also alleges the Article falsely portrays him as "an unethical businessman and negligent parent." *See* Compl. ¶ 2. But again, he does not identify any particular statement in the Article that actually uses these labels. Nor does he allege that any of the underlying facts—his federal bribery and fraud convictions, his large-scale use of assisted reproduction while in custody, or the concerns raised by

those working with him—are false.

Even if these terms had been used, the facts disclosed in the Article and relevant case law would protect such commentary. That Lindberg would launch such an expansive, high-risk reproductive endeavor while facing criminal prosecution and incarceration, and continue to coordinate the project from prison despite staff and financial strain, could invite legitimate criticism on both ethical and parental grounds. And criticism—particularly of a public figure's choices and values—is not defamation. These are classic expressions of opinion and subjective evaluation, not verifiable facts. *See, e.g.*, *Turner*, 879 F.3d at 1265 (finding statements indicating NFL coach exercised poor judgment by sending inappropriate text messages to player were statements of pure opinion); *Lauderback v. Am. Broad Cos., Inc.*, 741 F.2d 193, 195 (8th Cir. 1984) (statement agent was "unethical" was protected opinion).

Lindberg's effort to litigate here whether others might view him as "unethical" or a "negligent parent" is fundamentally incompatible with the First Amendment.

### C. Truth/Substantial Truth is Not Actionable as a Matter of Law.

The Complaint's failure to plead falsity plausibly is, itself, a basis for dismissal. *See Turner*, 879 F.3d at 1267; *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986) (noting "constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages"). Falsity, like all other elements of a cause of action, is subject to the *Iqbal/Twombly* standard. *See, e.g., Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258, 1270 (M.D. Ala. 2019), *aff'd*, 6 F.4th 1247 (11th Cir. 2021). Here, other than merely concluding the

speech is "false," there are no allegations as to which portions are false, no allegations of *how* they are false, and no allegations of *fact* that give rise to an inference of falsity. In this way the Complaint is the very definition of "conclusory."

Lindberg alleges that the Article falsely states he "selected egg donors exclusively based on eye color." *See* Compl. ¶¶ 16, 42. But that phrase does not appear anywhere in the Article. What the Article actually reports is that: (1) *almost all* of the women Lindberg pursued were models with blonde hair and blue or green eyes, and each said Lindberg told them he wanted to have children with them because of their looks (*id.* Ex. A, at 9); (2) Molina, his fiancée and a central coordinator of the project, told Bloomberg that Lindberg "preferred blue eyes because they were rare" and "didn't care about hair color" (*id.* Ex. A, at 12); and (3) Molina also used Instagram to recruit women by seeking out "blonde donors with blue or green eyes," describing them to potential candidates as intended for "clients" who "can't have kids." *Id.*

Lindberg does not dispute any of these facts. Nor does he deny he expressed preferences or repeatedly selected women with a particular look. His allegation that the Article falsely claimed he made his choices "exclusively" based on eye color is a mischaracterization of what the Article actually says—and even if the word "exclusively" had been used, it would not materially alter the gist of the reporting. *See Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702, 706 (Fla. 3d DCA 1999); *McCormick v. Miami Herald Publ'g, Co.*, 139 So. 2d 197, 200 (Fla. 2d DCA 1962). Because the Article's description of Lindberg's donor preferences is, at a minimum, substantially true and based on unchallenged factual reporting and Lindberg's own statements, it

cannot give rise to liability as a matter of law.

For this same reason, even if the Court were to construe the Article's use of the term "conned" connotes a provably false fact statement, it cannot form the basis of a defamation claim because Lindberg has not and cannot allege falsity. He offers no explanation of how the alleged statement, or use of the term "conned," is false. He does not challenge the Article's detailed reporting that some women said they were promised emotional involvement or future contact with the child, only to be cut off after their donations, that they were misled about who Lindberg was or the nature of the arrangement, or, in one case, never received the full promised payment. *See id.* Ex. A, at 2, 12-13. Nor does he allege that any of these women's stories were fabricated or misquoted.

To the contrary, the use of "conned," if held not to be opinion, is also (at a minimum) substantially true, based on the unchallenged disclosed facts in the Article discussed in more detail in Section I.B.2, *supra*. *See also Readon v. WLPG, LLC*, 317 So. 3d 1229, 1235 (Fla. 3d DCA 2021) ("The only 'false' statement attributed to [defendant] contained in the complaint did not affect the gist of the story by creating a different impression in the mind of the viewer."); *Gerace, Jr. v. McClatchy Co.,* No. 2023-001715-CA-01, 2024 WL 4037214, at *4 (Fla. 11th Cir. Aug. 27, 2024) ("A 'workable test' for determining whether the Article is substantially true is to 'eliminate the alleged falsities' from the Article and then assess how the 'common mind would understand' the Article with those words removed." (quoting *Bishop v. Wometco Enters., Inc.*, 235 So. 2d 759, 762 (Fla. 3d DCA 1970); *Hill v. Lakeland Ledger Publ'g Corp.*, 231 So. 2d

254, 256 (Fla. 2d DCA 1970)).  The Complaint should be dismissed for failure to plausibly allege falsity.

### D. Lindberg Cannot Plausibly Allege Actual Malice.

Still another independent ground for dismissal is Plaintiff's complete failure to allege facts plausibly suggesting that Bloomberg acted with actual malice.  The First Amendment guarantees "a defendant may not be held liable for defaming a public figure about a matter of public concern unless he is shown to have 'acted with actual malice.'" *Berisha*, 973 F.3d at 1310. Actual malice means that:

> defendants published a defamatory statement either with actual knowledge of its falsity or with a high degree of awareness of its probable falsity. It is a subjective test, which asks whether the publisher in *fact* entertained serious doubts as to the truth of his publication. Even an extreme departure from professional [publishing] standards does not necessarily rise to the level of actual malice.

*Id.* at 1312; *see Turner*, 879 F.3d at 1273; *Michel*, 816 F.3d at 702-03.

"Determining whether an individual is a public figure—and thus subject to the actual malice analysis—is a question of law for the court to decide." *Michel*, 816 F.3d at 702. Here, there is no serious dispute that Lindberg is a public figure who must plead actual malice. He touts himself as a "renowned entrepreneur, philanthropist, and author." Compl. ¶ 1. The Article includes uncontroverted details about his status as a billionaire insurance magnate, political donor, and federal convict whose activities—including the "baby project" at issue—have drawn public scrutiny and national press coverage. *See id.* Ex. A. The allegations in the Article concern not private conduct, but matters of public concern, including criminal proceedings, fertility industry oversight,

and the use of assisted reproductive technology, on which he has issued his own press release. *See id.* ¶ 19 and Ex. B. Lindberg's status as a public figure is beyond dispute.

Lindberg has not—and cannot—plead the high standard of actual malice. For a court to find actual malice, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). On a motion to dismiss, the Court must consider whether the allegations "satisfy the *Twombly/Iqbal* plausibility standard" and "must support a reasonable inference that the speaker or publisher made the false statement knowing it was false or with reckless disregard as to its falsity." *See Reed v. Chamblee*, No. 24-10058, 2025 WL 1874638, at *2-3 (11th Cir. July 8, 2025) (per curiam) (affirming dismissal of defamation claims and concluding that plaintiff "never alleged a key component of actual malice, which is that the Defendants had serious concerns about the accuracy of the published statements or were highly cognizant that the statements were likely false").

Instead, Linberg merely attempts to impugn motives of the journalists and their alleged newsgathering techniques, and alleges no facts supporting actual malice. *See* Compl. ¶ 17. Even accepting what Lindberg has pled, his allegations do not come close to establishing—or even raising an inference—that Bloomberg or the Article's reporters (two of the three Individual Defendants) knew or believed the Article was false or acted with serious doubts about its accuracy. See *Berisha*, 973 F.3d at 1312. Lindberg does not make any allegations about the journalists' state of minds at the time of publication, but, rather, complains about Bloomberg's post-publication

19

actions, which cannot form the basis for actual malice. *Klayman v. City Pages*, 650 F. App'x 744, 750-51 (11th Cir. 2016) (holding that "the defendants' failure to investigate" and "a mere refusal to correct a publication falls short" of proving actual malice; *Fairfax v. CBS Corp.*, 2 F.4th 286, 295 (4th Cir. 2021) ("CBS's alleged post-publication [refusal to correct or retract] here is not probative of its state of mind at the time of publication . . . .").

Ultimately, the Complaint reflects Lindberg's dissatisfaction with the tone and editorial framing of the Article, not any well-pleaded facts that would give rise to a plausible inference of publishing a knowing or reckless falsehood. These are precisely the kinds of assertions that courts have consistently rejected as insufficient to plead actual malice. *See Turner*, 879 F.3d at 1274; *Michel*, 816 F.3d at 706; *Reed*, 2025 WL 1874638, at *3; *Coral Ridge Ministries Media,* 6 F.4th at 1252-53. Because Lindberg's complaint is wholly devoid of facts giving rise to a plausible inference of actual malice—a showing required by the First Amendment for each of his defamation claims—dismissal is warranted.

## II.  PLAINTIFF'S TORTIOUS INTERFERENCE CLAIM ALSO FAILS

Plaintiff's claim for tortious interference is barred under Florida's single action rule. That rule provides that "a single publication gives rise to a single cause of action." *Samara v. Juice Plus+ Co., LLC*, No. 6:20-cv-520-Orl-31EJK, 2020 WL 13389215, at *5 (M.D. Fla. Sept. 9, 2020) (quoting *Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla. 4th DCA 2002)). It "prohibits defamation claims from being re-cast as additional, separate torts," if all the claims arise from the same publication.

*Kinsman v. Winston*, No: 6:15-cv-696-Orl-22GJK, 2015 WL 12839267, at *5 (M.D. Fla. Sept. 15, 2015). As the Florida Supreme Court has explained, a plaintiff is not permitted to make an end-run around a valid defense to defamation by "renaming the cause of action and pleading the same facts" as those alleged in support of a defamation claim. *Fridovich v. Fridovich*, 598 So. 2d 65, 69 (Fla. 1992); *see also Orlando Sports Stadium, Inc. v. Sentinel Star Co.*, 316 So. 2d 607, 609 (Fla. 4th DCA 1975) (a plaintiff cannot skirt the strict requirements of defamation "by the simple expedient of redescribing the libel action to fit a different category of intentional wrong"). Rather than being guided by the label a plaintiff puts on his claims, Florida courts "look for the reality, and the essence of the action and not its mere name." *Orlando Sports Stadium, Inc.*, 316 So. 2d at 609 (quotations omitted).

Federal courts have also acknowledged that extraneous tort claims rooted in challenged statements are barred regardless of whether the defamation claim fails. *See Tobinick v. Novella*, No. 9:14-CV-80781, 2015 WL 328236, at *11 n.17 (S.D. Fla. Jan. 23, 2015) (citing *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1256 (S.D. Fla. 2014) (court dismissed tortious interference and intentional infliction of emotional distress claims "based on analogous underlying facts. . . intended to compensate for the same alleged harm" as his defamation claims); *see also Fridovich*, 598 So. 2d at 70 ("In short, regardless of privilege, a plaintiff cannot transform a defamation action into a claim for intentional infliction of emotional distress simply by characterizing the allegedly defamatory statements as 'outrageous'"). If the claim is premised upon allegedly false and defamatory speech, it cannot masquerade as another tort. *See*

*Orlando Sports Stadium*, 316 So. 2d at 609.

Here, Plaintiff's tortious interference claim is rooted entirely in the same publication and alleged reputational harm that underlie his defamation counts. *See* Compl. ¶¶ 34-35 (repeating his claims that his alleged damages were caused by "***Defendants' defamatory statements***") (emphasis added). Because the count for tortious interference is nothing more than a re-labeled defamation count, it violates the single cause of action rule and must be dismissed. *See Klayman*, 22 F. Supp. 3d at 1256.

## III.    THE FALSE LIGHT CLAIM FAILS AS A MATTER OF LAW

Count IV, for "false light," barely warrants a response. The Florida Supreme Court's has made it clear that Florida does not "recognize a cause of action for false light false invasion of privacy." *Jews for Jesus, Inc.*, 997 So. 2d at 1114. Yet the Complaint inexplicably cites *Jews for Jesus* as if it supports Count IV. *See* Compl. (unnumbered paragraph preceding ¶ 37). Courts in this Circuit have consistently dismissed false light claims. *See, e.g.*, *Dowbenko v. Google, Inc.*, 582 Fed. Appx. 801, 804 (11th Cir. 2014); *Harrington v. Veritext, LLC*, No. 24-CV-22787, 2025 WL 1591614 (S.D. Fla. May 1, 2025). Count IV fails.

## IV.    NO INJUNCTIVE RELIEF UNDER FIRST AMENDMENT

Lindberg's request for injunctive relief must be denied because it seeks a classic unconstitutional prior restraint on speech. Specifically, he asks the Court to "issue a permanent injunction prohibiting Defendants from republishing only those specific statements" that he purportedly identifies in Paragraph 42 of the Complaint. *See*

Compl. (Count V Wherefore Clause). That demand is not merely disfavored under the First Amendment—it is categorically impermissible.[4]

The United States Supreme Court has repeatedly emphasized that "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). "Any prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity." *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). The Court has never upheld a prior restraint, even in cases involving competing constitutional rights or national security claims. *See, e.g.*, *Florida Star v. B.J.F.*, 491 U.S. 524, 532 (1989); *Okla. Publ'g Co. v. Dist. Court in and for Okla. Cty.*, 430 U.S. 308, 311 (1977); *see also Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996). Florida courts have followed suit. *See, e.g.*, *Baskin v. Royal Goode Prods., LLC*, No. 8:21-cv-2558, 2021 WL 6125612, at *6 (M.D. Fla. Nov. 19, 2021) (finding injunctive relief was unconstitutional prior restraint where "plaintiffs have not shown that the extraordinary remedy . . . is warranted").

To put it mildly, this case does not remotely constitute an exceptional case worthy of overcoming the presumption of unconstitutionality. Indeed, it has been filed by a convicted felon who pled guilty to federal crimes and has spent a considerable amount of time behind bars, yet he now blames Defendants, rather than himself, for damaging his reputation. His request is little more than a demand to censor speech he

---

[4] And for the same reasons discussed in Section II, *supra*, the Count also violates the single cause of action rule.

dislikes, which is exactly what the Constitution forbids.

## V.    VIOLATION OF FLORIDA'S ANTI-SLAPP STATUTE

Florida's anti-SLAPP[5] statute provides a substantive right to recover fees from plaintiffs "fil[ing] . . . any lawsuit . . . against another person or entity without merit and primarily because such person or entity has exercised the constitutional right of free speech in connection with a public issue . . . as protected by the First Amendment to the United States Constitution and s. 54, Art. I of the State Constitution." § 768.295(3-4), Fla. Stat.; *see, e.g.*, *Reed v. Chamblee*, No. 3:22-CV-1059, 2024 WL 69570 (M.D. Fla. Jan. 5, 2024) (granting media defendants' motion for attorneys' fees under Florida's anti-SLAPP statute); *Corsi v. Newsmax Media, Inc.* 519 Supp. 3d 1110, 1128 (S.D. Fla. 2021) (same); *Bongino*, 477 F. Supp. 3d at 1322–24 (same, noting Florida's statute does not conflict with Federal Rules of Civil Procedure). This action here falls squarely within the statute's prohibition and mandates a fee award.

First, this case was filed "primarily"—indeed, exclusively—as a result of the Defendants' protected speech and seeks to silence speech with a flatly unconstitutional prior restraint. Second, the statute defines "free speech in connection with public issues" to include any "statement that is protected under applicable law and . . . is made in or in connection with a . . . news report, or other similar work." § 768.295(2)(a).  As amply demonstrated, the Article is protected speech published by a global news organization and not actionable as a matter of law. Finally, the instant

---

[5] SLAPP stands for **S**trategic **L**awsuits **A**gainst **P**ublic **P**articipation. § 768.295, Fla. Stat.

suit is "without merit" because, for the reasons stated above, the Complaint collapses under the weight of its legal deficiencies. Because Lindberg's suit violates this statute, the Defendants request leave to move for entitlement to and an award of attorney's fees at an appropriate time in accordance with Local Rule 7.01.

## CONCLUSION

Defamation cases involving First Amendment rights are especially suited for early dismissal due to their chilling effect on speech.  *See Michel*, 816 F.3d at 707. Dismissals are routinely granted where, as here, the claims are legally deficient for multiple, independent reasons, including that the challenged statements are opinion or substantially true.

Accordingly, the Complaint fails to state a claim against Bloomberg and should be dismissed with prejudice under Rule 12(b)(6). Bloomberg's anti-SLAPP fee request should also be granted.

## LOCAL RULE 3.01(g) CERTIFICATION

The undersigned certifies that she has conferred with opposing counsel via email on July 16, 2025, and Plaintiff opposes this Motion.

Dated:  July 18, 2025                    Respectfully submitted,

THOMAS & LoCICERO PL

*/s/ Carol Jean LoCicero*
Carol Jean LoCicero (Lead Counsel)
  Florida Bar No. 603030
Linda R. Norbut
  Florida Bar No. 1011401
601 South Boulevard
Tampa, FL  33606

Telephone: (813) 984-3060
Facsimile:  (813) 984-3070
clocicero@tlolawfirm.com
tgilley@tlolawfirm.com

*Attorneys for Bloomberg*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 18th day of July, 2025, the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, and is being served this date on all counsel of record via transmission of Notices of Electronic Filing generated by the CM/ECF system.

*/s/ Carol Jean LoCicero*
Attorney